# COURT OF APPEALS OF TEXAS.

## GALVESTON TERM, 1879.

---

### THOMAS J. MYERS *v.* THE STATE.

1. EVIDENCE. — Though the acts and declarations of one co-conspirator, in pursuance of the common design, are the acts and declarations of all his confederates, and are original evidence against each of them, yet a predicate for their introduction should ordinarily first be laid by proof deemed by the court to be sufficient to establish, *primâ facie*, the fact of conspiracy, or by proof proper for the consideration of the jury as tending to establish that fact.

2. SAME — PRACTICE. — It is, at best, of doubtful propriety to admit improper evidence to go to the jury, and depend upon controlling its effect by instructions to be given them; and this is especially true in exciting criminal trials. If, for instance, the prosecution be allowed to prove the acts or declarations of persons inculpated by the evidence, but fails to connect the accused with them, the better practice would be to withdraw all such improper proof from the jury, rather than to allow them to consider it, subject to their instructions.

3. CHARGE OF THE COURT. — Instructions on the subject of circumstantial evidence should be so framed as to guard the jury from basing their findings upon mere surmises.

APPEAL from the District Court of Johnson. Tried below before the Hon. W. D. WOOD.

The indictment charged the appellant with the murder of Mrs. Mary A. Hester, on February 21, 1877, by shooting her with a gun. James M. Bowden and Samuel H. Myers, who is a half-brother of the appellant, were also separately indicted for the same offence.

The homicide was an assassination of more than ordinary atrocity. Mrs. Hester was the step-mother of the appellant and Samuel H. Myers, having been the third and surviving wife of their deceased father, of whose will she and

the appellant were executors. On the evening of the 21st of February, 1877, having but recently become the wife of J. A. Hester, she was shot while sitting at her supper-table, and instantly killed. The shot was fired through a window, and carried away a part of her head. Though there were other inmates in the room at the time, none of them recognized the assassin.

The appellant was tried at the June term, 1878, of the District Court of Johnson County, and, being found guilty of murder in the first degree, was adjudged to suffer the penalty of death. This result was doubtless due, in the main, to the testimony of James M. Bowden, who was made a witness for the State. The significance of the rulings made by this court depends upon the evidence, and requires a detailed account of its substance.

John Clarriage, a brother-in-law of the appellant, was the first witness introduced by the State. It appears from his testimony that he, Mr. Hester, and the appellant, as well as Bowden, and John and Samuel H. Myers, all lived in the same neighborhood, in Johnson County. About sunset on the day of the murder, the appellant and Sam Myers came to witness's house, and appellant asked why witness had sent his wife ·to the appellant's house, two days previous, after some money coming to her from their father's estate. Witness replied that he had not sent his wife, and could so prove by her. Appellant gave witness the d—d lie, and after talking and quarrelling awhile, he and Sam rode off about a hundred yards, the former in a southern direction and the latter in a western. Appellant next rode across to Sam, and they seemed to be talking, but witness could hear nothing they said. They then came back to witness's house, and appellant offered witness $25 to come out of the yard and fight him. He was angry, and said that this was a premeditated affair; that Mrs. Hester was as much to blame as any one else; and that the trouble had just begun, and he did not know where in the devil it

would stop, — adding: " You need not be uneasy. I will not do you any secret injury ; but you are in danger." Then they rode off about sixty yards, and seemed to be talking. Next they returned, dismounted, came into the house, and appellant said : " Clarriage, I want that difficulty settled between you and Sam ; and if you will come over next Monday, I will settle with you." About dark they went off south, in the direction of Hester's. In about half an hour afterwards, witness and his wife went to McCoghren's, a neighbor who lived some three hundred yards off; and when they were within one hundred yards of McCoghren's, witness heard the report of a gun, followed by screaming, at Hester's, which was between a quarter and a half mile distant. Witness left his wife at McCoghren's and ran over to Hester's, where he found Mrs. Hester on the floor, dead, the top of her head having been blown off. Others were at the house, and the appellant came there in about an hour and a half after the murder. Next morning, witness followed a track made by a run-down boot, which started from a smoke-house on the north-east of the residence, and passed over ploughed ground, in a westerly direction, to a fence ; and, about two panels above where the man apparently crossed the fence, witness found, outside the fence, and about one hundred yards from the house, something which looked like horse-tracks. The road from the witness's house to that of the appellant passes by the place where Hester and wife lived. This witness proved time and venue as alleged in the indictment. He acknowledged that he did not like the appellant much, on account of treatment received from him. Appellant and Sam had no arms in sight when at witness's house.

J. A. Hester, husband of the murdered woman, and the second witness for the State, testified that she was killed about dark, while sitting at table, eating her supper. She was shot from the outside of the house, through the only window in the room. Witness did not know who killed

her.  Bowden was arrested that night, and was at the inquest next day.

D. Richardson, for the State, testified that he was on the jury of inquest, the day after the murder.  He examined the room, and found pieces of skull, part of the brain, and blood ; and from the window he and others followed fresh tracks about two hundred yards, to the fence, and at the fence was a fresh horse-track, and indications that a horse had been hitched or held there the night previous.  The man's track appeared to be that of a No. 8 shoe or boot, run down at the heel.  Sam Myers was at the inquest, and had on a run-down boot, which witness thought corresponded with the track.  Bowden's boot was straight.  Appellant testified at the inquest, and stated that on the day of the murder he and his brother Sam had been to Cleburne, the county-seat, and came from there to Clarriage's, and thence to his own house, and got supper, and then went to John Myers's ; and, being specially asked if they did not meet some one on the road between his house and John Myers's, he emphatically said they did not.  Sam Myers also testified at the inquest, and kept his feet crossed, and under the chair.  The tracks witness spoke of went in about the direction of the cross-roads at the school-house, which is west of Hester's.

A. J. Wynne, for the State, testified that, on the evening Mrs. Hester was married to Hester, he heard the appellant say that if she did marry, she would get her foot into it G—d d—d bad.

J. R. McKenzie, for the State, testified that, early in the day of the murder, he got the appellant to accompany him to Mrs. Hester's, to whom witness wished to pay some money. While there, Mrs. Hester said that there was Sam at the porch, and she would drive him off ; that he had been trying to get her children to run off from her ; and then the appellant exclaimed, " Stop ! stop !  I will take him away," and went out.  Witness did not see Sam Myers on that occa-

sion, nor personally know that he was there.   On the same day, witness was at Cleburne, and heard the appellant ask Col. Hall for a copy of his father's will, presenting an order for the same from Mrs. Hester.   Hall talked with appellant about the will, and told him that he would advise them to keep out of law ; and asked the appellant, " What are you all cutting up about."   To which the appellant replied, " She may have other children? "   Witness stated that Mrs. Hester and the appellant seemed to be on perfectly friendly terms, and that he never heard the appellant say any thing against her.

Col. J. M. Hall, for the State, gave a fuller account of his interview with the appellant on the occasion spoken of by McKenzie.   He had previously told the appellant that he could not deliver to him his father's will without an order from Mrs. Hester.   On the day she was killed, the appellant presented to witness an order from her, and they talked about the will and the estate.   Witness advised against any litigation over the matter, and told the appellant that by the terms of the will the property, on Mrs. Hester's marriage or death, would go to her children by his father ; and asked the appellant, " What are you all cutting up about? " to which he replied that Mrs. Hester might have other children.   Witness thought that appellant had previously received his portion of his father's estate, and had no further interest in it.

R. Hicks, for the State, testified that he was at W. A. Hunter's, about a mile from Hester's, the night of the murder.   Some time after dark, two young men came and reported the assassination, and witness and Mrs. Hunter started to Hester's in a wagon.   Within some five hundred yards of Hester's, they met the appellant and Sam Myers, who rode by within eight or ten steps of the wagon, and came from the direction of Hester's.   Mrs. Hunter spoke to Sam in a tone loud enough to be heard, as witness thought, but witness heard no reply from Sam.   This was about

half-past seven o'clock, and was on a road which leads from the appellant's to John Myers's. Witness saw no arms about the appellant or Sam Myers on that occasion. If they had had a gun, witness could have seen it.

James A. Bowden, under indictment for the murder of Mrs. Hester, was next introduced by the State. He testified that about the last of January, 1876, the appellant and John Myers were at a blacksmith-shop, talking about their father's estate, and the appellant said it had given him a heap of trouble, and he wished he was several miles away. In January, 1877, Sam Myers came to witness's house, and asked witness to go to Fort Worth to buy a wagon, and requested witness to take his gun along. Witness asked why he should take his gun, and he replied that he would tell witness if witness would not tell any body else. He said he would go around behind John Myers's field with the gun, and would go and kill old Mary Ann (Mrs. Hester), and come back and give the gun and some money to witness, who could get to Fort Worth by eleven o'clock that night, and prove an *alibi;* and that he would go to John Myers's and pretend to be sick. Witness would not carry the gun when he heard the motive. On the Monday next before the Wednesday of the murder, witness and Sam Myers came from Fort Worth together. On Wednesday, Sam told witness he was going to put old Mary Ann off the place (the former residence of Sam's father) before Sunday, and asked witness to meet him that evening at the cross-roads near the school-house, on the hill, some three or four hundred yards north-west from Mrs. Hester's. Sam asked witness to load his gun with buckshot, and bring it along. According to this appointment, witness went with his gun about dusk; and just after he got to the place, Sam Myers came there on horseback, from the direction of Mrs. Hester's. He dismounted, took the gun, asked witness if it was loaded as he directed, and said it was about supper-time, and he would find her at the supper-table. Witness

held the horse, and Sam went off in the direction of Mrs. Hester's house, and in four or five minutes witness heard the report of a gun at the house, and heard screaming there. Sam returned from the direction of the house to where witness was holding the horse, and said that he had found her at the supper-table, and shot the right side of the top of her head off. He gave witness the gun, and directed him to load both barrels with small shot; and ther he took the horse and rode off, and witness went home. The gun was a double-barrelled shot-gun. One of the barrels had been discharged since witness gave it to Sam, and witness drew the load out of the other barrel, and loaded both with small shot.

J. C. Weaver, for the State, testified that, soon after the marriage of the deceased with Mr. Hester, the appellant, in a conversation about the division of his father's estate, spoke of the marriage, and said he was afraid hell would be to pay over it.

Albert Combs, for the State, testified that, about two weeks before the murder, he went to Cleburne with Sam. Myers and J. M. Bowden, and heard Sam say he had been to Mrs. Hester's a few days before, and cursed her out, and called her a d—d old bitch, and that if he could not get revenge one way he would another. Appellant was not present, and witness had never heard him speak of Mrs. Hester.

Frank Williams, for the State, testified that, about January 1, 1877, Sam Myers, in talking about his father's wives, said that he was told the first of them was a good woman, and he knew his mother was a good woman, but that the last one, now Mrs. Hester, was a G—d d—d bitch, and he intended to blow her brains out the first time she crossed him or his sisters. Appellant was not present, and did not hear these statements.

John Clarriage and J. A. Hester, recalled by the State, said that, from the places to which the appellant and Sam

Myers rode out from Clarriage's house, the evening of the murder, they could have seen Bowden at the cross-roads.

Lewis Myers, a son of Mrs. Hester by her former husband, testifying for the State, gave his age as eleven years, and stated that he knew the nature of an oath. He was at the supper-table when his mother was killed. He fell under the table, and she fell on the floor. Before dark, the same evening, he went down to the back of the cow-lot to get some kindling-wood, and while there, and some two hundred yards from the house, he saw the appellant and Sam Myers sitting on their horses in the road, and about fifty yards beyond witness, and facing in the contrary direction from him. They were talking, and witness heard the appellant say "G—d d—n." Witness did not see that either of them had a gun. He returned to the house and told his mother, in the presence of others of the family, about seeing the appellant and Sam in the road. Sam Myers had previously told witness that if he (witness) did not leave, he would not have any home; and after the murder, Sam offered witness a six-shooter and $10 to leave home. Appellant was not present, and did not hear this talk.

W. Atterberry, for the State, described the tracks leading from the window, and concurred with previous witnesses respecting them, but added that they were too small to have been made by the appellant.

Thomas Coulter, for the State, testified that he and others, about nine o'clock the night of the murder, arrested James M. Bowden and took him to Hester's, where he was kept until the inquest was concluded, the succeeding day, and he was then taken to jail. Witness examined Bowden's double-barrelled shot-gun when the arrest was made. Both barrels were loaded with powder and small shot, but there were indications that it had recently been discharged.

Other testimony was introduced by the prosecution, but it was either cumulative or immaterial. So much of that

detailed as relates to the threats and conduct of Sam Myers and of Bowden, made and done in the absence of the appellant, was admitted over objection by the defence, and bills of exception were duly reserved. After its admission, the defence moved the court to exclude it from the jury, because no complicity of the appellant in the common design of Bowden and Sam Myers was shown, and because it was hearsay and irrelevant in relation to the appellant, and likely to mislead the jury. This motion was overruled, and the defence reserved exceptions.

The State having closed, the defence first introduced the two indictments by which James M. Bowden and Samuel H. Myers were separately charged with the murder of Mrs. Hester.

James Keith, for the defence, testified that, on the day after the murder, he followed the track supposed to be that of the assassin, through the ploughed ground and the timber, and across the prairie, to the rear of Bowden's field, and about two hundred yards from his house. He measured the track, and found that its length corresponded with that of Bowden's boot. Witness thought that Bowden and Sam Myers wore boots of about the same size. The tracks were in the direction of the cross-roads, and towards Bowden's house.

Charley Myers, a son of John Myers, and nephew of the appellant and Sam Myers, eleven years of age, and a witness for the defence, testified that Sam Myers lived at John Myers's, and left there on the morning of the day of the murder, wearing a pair of new boots, not run down, and with brass on the heels. Witness saw no more of his uncle Sam until the next morning, and then saw him get up and dress, at witness's father's house, where he had passed the night of the murder. Sam did not eat supper there that night. He went over to Hester's the morning after the murder.

M. Rawlings, for the defence, stated that he had known

Bowden since 1875, and stayed at Bowden's, but worked at John Myers's gin.    Witness thought that Bowden's feelings towards Mrs. Hester were not good.    While witness was staying at Bowden's, the latter wrote a letter to Mrs. Hester, and wanted witness to copy it, and drop it in her yard; and when witness refused to do so, Bowden burned the letter.    He said he did not want it known who wrote the letter, and his handwriting might be recognized; and said he would pay witness well.    The letter said that if Mrs. Hester did not, by a certain time, pay his wife some money due her from the estate, her house should be set on fire, and her brains shot out as she ran out of it.    No name was signed to the letter, and it said: "You may think that James M. Bowden wrote this letter, but that is not so; it was written by a friend of Mrs. Bowden."    Witness heard Bowden offer money to Jack Turner to kill Mrs. Hester; thinks the amount was $200, and the time between the 10th and 15th of January, 1877.

Jack Turner, for the defence, testified that, between the 10th and 15th of January, 1877, he was at Bowden's house, and Bowden asked him if he did not want to make some money; and, on witness replying that he did, Bowden offered him $50 if he would kill Mrs. Hester.    This occurred in the presence of Rawlings, the preceding witness.

D. Hampton, for the defence, testified that he examined the tracks supposed to have been made by the assassin of Mrs. Hester.    In the ploughed ground the person seemed to have been running, and the heels stuck down in the ground two or three inches, but the tracks were not made with a run-down boot.    Some two hundred yards outside of the field, he found what he took to be the same track, and followed it to the back of Bowden's field, about two hundred and fifty yards from his house.    It seemed to have been made by a No. 8 boot or shoe, and passed about fifty yards to the right of the cross-roads.    Sam Myers wore

about a No. 7 boot.   This witness was a brother-in-law of the appellant.

Dr. J. E. Russell, for the defence, stated that, about eight o'clock the night Mrs. Hester was killed, he was called upon to go in haste to John Myers's house, to see his wife, who was said to be very sick.   On the road, witness met Sam Myers, coming in a run, who turned back, and told witness to hurry, as he did not believe John's wife would live until he and witness could get there.   When they got near the appellant's house, they found him standing on the side of the road, holding his horse.   He told witness to hurry up, that John's wife was very sick ; and he also came along.   The road went by the appellant's, and within one hundred and fifty yards of Hester's.   They passed Hester's between eight and nine o'clock, riding as fast as witness could endure.   Witness heard no crying or unusual noise at Hester's as they passed, but his whole attention was fixed on getting to John Myers's sick wife, who proved to be very sick with congestion.   When they reached the place, the appellant and Sam Myers went into a room other than that occupied by the sick lady, and witness saw them no more that night.   About ten o'clock that night, intelligence came of the murder of Mrs. Hester.

This concluded the evidence in the case.   The opinion of this court treats of such portions of the charge to the jury as are involved in the rulings made.   Special instructions on the subject of circumstantial evidence were asked by the defence, but were refused on the ground that they were substantially given in the general charge.

As already stated, the jury found the appellant guilty of murder in the first degree, and the court adjudged against him the penalty of death, as prescribed by law for that offence.   A new trial was asked and refused, and an appeal taken from the judgment.

*Amzi Bradshaw, Poindexter & Bradshaw,* and *Good &*

*Bower*, filed able and zealous briefs and arguments in behalf of the appellant.

*Thomas Ball*, Assistant Attorney-General, for the State. The declarations of Sam Myers were admissible if the conspiracy was established. They were admissible as circumstances to determine whether a conspiracy did or did not exist. The court was bound to admit all evidence tending to establish a conspiracy, so that it could be intelligently determined whether a conspiracy did or did not exist. Whart. Cr. Law, secs. 702, 2352.

It is submitted that the State made out a *primâ facie* conspiracy; and that the court below should not have instructed the jury that no conspiracy was proved, and that they should not consider the declarations of Samuel H. Myers in determining the guilt or innocence of this appellant. Whart. Cr. Law, secs. 2351, 2355; *Rex* v. *Parsons*, 1 W. Black. 392; *Hardin* v. *The State*, 4 Texas, 366; *The People* v. *Mather*, 4 Wend. 230; *The Commonwealth* v. *Crowninshield*, 10 Pick. 498; *Pudsey's Case*, 1 Hale, 534.

With reference to the sufficiency of the evidence to sustain the verdict, see *Williams* v. *The State*, 41 Texas, 208.

Winkler, J. The appellant was tried at the June term, 1878, of the District Court of Johnson County, for the murder of Mrs. Mary A. Hester, alleged to have been committed February 21, 1877, and was convicted of murder in the first degree, and adjudged to suffer the death penalty. A motion for a new trial was made and overruled, and this appeal is prosecuted.

It is shown by the record that Mrs. Hester was most foully murdered, at her home in Johnson County, whilst sitting at the supper-table, by the discharge of a shot-gun by some one from the outside of the house.

Three persons are charged, in separate indictments, each with the perpetration of the crime, viz., James M. Bowden, Samuel H. Myers, and this appellant. On the trial below, counsel for the prosecution placed Bowden on the stand as a witness, who testified, among other things, that he and Samuel H. Myers had perpetrated the murderous deed, Bowden furnishing the shot-gun and Sam doing the shooting. Other witnesses testified for the State, apparently for the purpose of corroborating the testimony of the witness Bowden, by proving certain threats made by Samuel H. Myers against Mrs. Hester, and statements made by Samuel H. Myers concerning the deceased, going to show ill-feeling on his part towards her; and also for the apparent purpose of connecting this appellant with the supposed conspiracy between Bowden and Samuel H. Myers to take the life of Mrs. Hester, and also to connect him with the murder in such manner as to render him amenable to the law as a principal offender.

The most important questions for consideration here arise on bills of exception taken to the ruling of the court in admitting evidence over the objections of counsel for the accused, relating to the testimony on the subject of a corroboration of the testimony of Bowden, and the testimony offered to connect this appellant with the acts and declarations of Samuel H. Myers, so as to render him liable as a co-conspirator on the one hand, or as a principal on the other, and involving the charge of the court on these subjects. It appears that when the prosecution proposed to prove " declarations, threats, and statements made by Samuel H. Myers at different times and places, before the death of Mrs. Hester, abusive of her and to take her life," a bill of exceptions recites that all this testimony was objected to, " because it was not shown that the defendant, T. J. Myers, was present at the time of said several declarations, threats, and statements of said Samuel H. Myers, and because the same were mere hearsay."

The judge appends to the bill of exceptions the following explanation of his action, to wit : "All of this character of testimony was admitted upon the ground that the court had to determine as a fact whether or not a conspiracy or common design existed between the several persons charged with the murder of Mary A. Hester, before it (the court) could determine whether these declarations were competent or incompetent, and that a conspiracy or common design may be established by circumstances, as well as any other fact ; that the court could not intelligently determine this question till the testimony for the State was closed ; and that the consideration or non-consideration of these matters by the jury would be controlled by the charge."

It is also shown by bill of exceptions, that counsel for the accused moved the court to exclude the testimony of Bowden, after he had testified, "because his testimony was not corroborated, and because there was no evidence tending to corroborate it, or any part thereof, and because Bowden testified that the defendant was not connected with the killing of Mrs. Hester." The reason for overruling the motion is thus stated by the judge, in giving a bill of exceptions to the ruling : "The court refused this motion on the ground that, as to whether there was any evidence tending to connect the defendant or Sam Myers with the killing of Mrs. Hester, outside of the testimony of Bowden, and tending to corroborate his testimony, was a fact for the jury, to be determined by them from all the evidence they were permitted to consider by the court."

It is further shown by bill of exceptions, that, after the witnesses Bowden, Combs, Williams, Lewis, Myers, Wynne, and others, in relation to declarations, threats, and statements made by Samuel H. Myers against Mrs. Hester, before her decease, had been admitted, counsel for the accused moved the court to exclude their testimony from the jury, on these grounds : "Because (1) no conspiracy was shown between this defendant and James M. Bowden and Samuel

H. Myers, or either of them, to take the life of said Hester, and no proof of a common design between this defendant and said Bowden and Myers, or either of them, as would justify the admission of the declarations of said Bowden or Myers as those of co-conspirators in said murder; (2) the same were mere hearsay, so far as this defendant is concerned; (3) the same were wholly irrelevant, and calculated to mislead the jury."

The court, in giving a bill of exceptions to the overruling of the motion, makes the explanation that it was "announced to counsel for the State and the defence that the statements of Sam Myers, unless in the presence of defendant, and assented to by him, showing or tending to show that he or any other person killed Mary Hester, could not be evidence against the defendant in this case; and that a conspiracy or common design might be established by circumstances; and that the court could not determine this as a question of fact, necessary to be determined in order to pass on the competency or incompetency of such declarations, until the State had closed its testimony; and that the matter would be controlled by the charge; and that the court overruled the motion of the defendant at the time, on this ground alone."

The court charged the jury on the vital questions disclosed by the record, as follows, embracing the fourth and fifth paragraphs of the charge: —

"4. A conviction cannot be had upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the offence committed; and the corroboration is not sufficient if it merely shows the commission of the offence. The jury are instructed that the witness Bowden stands before you in the attitude of an accomplice in the murder of the deceased, Mrs Mary A. Hester; and that you cannot find, solely upon the evidence of the witness Bowden, that Sam Myers, or any other person, is guilty of the mur-

der of Mrs. Hester, unless there is evidence before you other than the testimony of Bowden, which evidence tends to connect the said Sam Myers with the commission of the killing, thus corroborating the testimony of said Bowden; and this corroborating evidence of the witness Bowden, and tending to connect Sam Myers with the killing of Mrs. Hester, must be in reference to some fact other than the fact that Mrs. Hester was killed, and killed by a gunshot wound, otherwise you cannot legally find from the testimony of Bowden that Sam Myers killed Mrs. Hester. If, under the foregoing instruction, you are satisfied, beyond a reasonable doubt, that Sam Myers killed Mrs. Hester, you are further instructed that you must be convinced by the evidence, beyond a reasonable doubt, in addition, that the defendant in this case, Thomas J. Myers, was, in some of the ways defined by the law, so connected with the killing of Mrs. Hester as to make him a principal in said killing, or you will acquit the defendant.   So far as any statements of Sam Myers are concerned, that may be before the jury, tending to show or connect him with the killing of Mrs. Hester, they are not legal evidence upon which you can convict the defendant in this case of the murder of Mrs. Hester.   The evidence, outside of any statements of Sam Myers, except such as were made in the presence of the defendant, and to which he assented, must convince the minds of the jury, beyond a reasonable doubt, that Sam Myers did kill Mrs. Hester, and that the defendant, Thomas J. Myers, was so connected with the killing of Mrs. Hester as to constitute him a principal in such killing; otherwise, you will acquit the defendant.

"5. If from the evidence in this case, and the law in reference to the same, as authorized in this charge, the jury shall believe, beyond a reasonable doubt, that, in the county of Johnson, at any time before the finding of the bill of indictment in this cause, Sam Myers did, with a gun, the same being a deadly weapon, with his express malice,

shoot at and kill Mary A. Hester, — that is, you so find that he shot at and killed the deceased, with a sedate and deliberate mind, and fixed purpose and formed design to kill the deceased, or do her some great bodily injury, — then, in law, Sam Myers would be guilty of murder in the first degree; and if the jury shall find from the evidence, beyond a reasonable doubt, that the defendant, Thomas J. Myers, did advise the said Sam Myers, or agree with him, to kill said Mary A. Hester, and was present at the time she was killed, or that the said Thomas J. Myers knew the unlawful intent and purpose of said Sam Myers," etc., — giving a proper charge on the subject of principals as defined in the Code.

The ninth and concluding paragraph of the charge is as follows : " There is in this case no evidence before you that the defendant, Thomas J. Myers, killed Mary A. Hester, or of a conspiracy between the defendant and Sam Myers to kill Mary A. Hester. This being the case, the statements of Sam Myers that he did kill Mary A. Hester, or his declarations showing an intent to do so, or in any other way tending to establish the fact that he did so, except such statements (if any) made in the presence of this defendant, and to which he assented, cannot be considered by you as in any way′ establishing the fact, as against this defendant, that Sam Myers, or any other person, killed Mrs. Mary A. Hester ; but in this case you must be satisfied that Sam Myers did kill Mary A. Hester, from evidence, beyond a reasonable doubt, other than any statements of Sam Myers confessing the same, or tending to establish the same (except as before stated) ; and if you do not so find, then you will acquit the defendant. But if you are satisfied that Sam Myers did kill Mary A. Hester, by the testimony other than the statements of said Sam Myers, yet if you so find, but do not find from the evidence, beyond a reasonable doubt, that the defendant, Thomas J. Myers, was connected with the killing of Mary A. Hester, in some one of the ways which, under the law in this charge given you, will constitute him

a principal in said killing, you will acquit the defendant. The statements of Sam Myers would be evidence against him to show that he did the killing, if he was on trial, but, not being on trial, cannot be taken against this defendant to establish his guilt."

We do not propose, nor is it necessary, to discuss the law of conspiracy as applicable to trials for the offence of conspiracy, further than to say that by the Texas Code conspiracy is a substantive offence, which may be committed by two or more persons, and which is indictable and punishable as such, and that courts and counsel often confuse the writings on the subject with the rules of evidence applicable to ordinary cases. In the present case, to our mind, the question raised upon the evidence, and the principles of law embodied in certain portions of the charge, would have more direct application to a trial for the crime of conspiracy, or to a case where more than one person may be jointly indicted for a given offence, than to a case like the present, where one person is alone on trial, and is charged singly by the indictment. Nor do we propose to discuss the question of admitting evidence to establish a conspiracy, when none is averred in the indictment.

On trials for the crime of conspiracy, it may be stated, in a general way, that whatever tends to prove the essence of the offence — that is, *the unlawful agreement and combination* of the parties — would be admissible in evidence, and may be either direct or circumstantial, generally the latter. 3 Greenl. on Ev., sects. 91, 93. By our Code, a conspiracy is defined to be an agreement entered into by two or more persons to commit any one of the following offences, to wit : murder, robbery, arson, burglary, rape, or theft. 2 Pasc. Dig., arts. 6576, 6580. In trials for this offence, the following rule, laid down by Mr. East, is cited by Mr. Roscoe : " The conspiracy or agreement among several to act in concert, for a particular end, must be established by proof before any evidence can be given of the act of any

person not in the presence of the prisoner ; and this must, generally speaking, be done by evidence of the party's own acts, and cannot be collected from the acts of others, independent of his own, — as, by express evidence of the fact of a previous conspiracy together, or of a concurrent knowledge and approbation of such others' acts." Roscoe's Cr. Ev. 383. But we do not propose to make any ruling on this subject, but simply to call attention to it.

As to the general question of the admissibility of the statements of persons in evidence, the general rule is given by Mr. Greenleaf. Acts and declarations of one of a company of conspirators are admissible in regard to the common design. "Here (says this writer) a foundation must first be laid by proof sufficient, in the opinion of the judge, to establish *primâ facie* the fact of conspiracy between the parties, or proper to be laid before the jury as tending to establish such fact. The connection of the individuals in the unlawful enterprise being thus shown, every act and declaration of each member of the confederacy, in pursuance of the original concerted plan, and with reference to the common object, is, in contemplation of law, the act and declaration of them all, and is, therefore, original evidence against each of them." 1 Greenl. on Ev., sect. 111.

We see no serious objection to the rulings of the court on the evidence, except that, when the evidence had all been admitted, and the court found that there was no evidence of a given fact, the subject had better have been withdrawn from the consideration of the jury entirely. It is of doubtful expediency, to say the least of it, to admit improper evidence to the jury, and depend upon controlling it by a charge ; and especially so in an exciting criminal trial.

As to the general charge of the court, it appears to have guarded every right of the accused with great care. The law relating to principals in crime was properly given to the jury. In one important particular, however, we are of

opinion an error was committed, calculated to prejudice the rights of the accused and to mislead the jury in determining upon their verdict.    The court charged, in a general way, that the uncorroborated testimony of an accomplice would not support a verdict of guilty, but failed to inform the jury as to who are accomplices in the sense requiring corroboration.    True, the jury are told that the witness Bowden stands in the light of an accomplice, but when an attempt is made to apply the general rule to the case on trial (the testimony of Bowden, and the necessity of corroborating his testimony), the charge is confined chiefly to Sam Myers, not on trial, rather than to the defendant then on trial, and was not so worded or guarded as not to allow the jury to consider the testimony of Bowden for what they might consider it worth without corroboration, so far as the defendant was concerned.

We are of opinion, further, that the charge on the subject of circumstantial evidence was, in view of the evidence, defective.    A charge on this subject should be so guarded as to confine the action of the jury to facts, rather than mere surmises.    *Hampton* v. *The State*, 1 Texas Ct. App. 642 ; *Black* v. *The State*, 1 Texas Ct. App. 368.    The attention of the court was invited to this omission, by an instruction asked and refused.

The objections to the indictment were not well taken.

To our minds, the question of the guilt of this appellant was made to depend to so great an extent upon the guilt of Sam Myers, that the jury must either have been misled by the charge, or have disregarded it in making their verdict.

This matter being brought to the attention of the court in the motion for a new trial, the motion, therefore, should have been granted ; and because of error in refusing a new trial, the judgment is reversed and the case remanded.

*Reversed and remanded.*